

FILED

Jun 21 2019, 7:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Michael R. Limrick
Hoover Hull Turner LLP
Indianapolis, Indiana

Megan Stuart
Indiana Legal Services, Inc.
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Name Change of M.E.B., <br><br> M.E.B., <br><br> *Appellant-Petitioner*. | June 21, 2019 <br><br> Court of Appeals Case No. 19A-MI-118 <br><br> Appeal from the Orange Circuit Court <br><br> The Honorable Steven L. Owen, Judge <br><br> Trial Court Cause No. 59C01-1809-MI-272 |

**Baker, Judge.**

[1] M.B. is a transgender woman who seeks to change her name and gender marker. She filed requests to waive publication and seal the record pursuant to Indiana Administrative Rule 9. The trial court found that she did not meet her burden under Rule 9. We disagree. Therefore, we reverse and remand with instructions that this case shall remain sealed and for further proceedings.

## Facts

[2] M.B. was assigned male at birth but identifies as female. On September 24, 2018, M.B. filed a verified petition for change of name and gender marker and a verified written request to prohibit public access pursuant to Administrative Rule 9, asking the trial court to waive the publication requirement and seal the record.

[3] In support of her request to prohibit public access, M.B. attested as follows: "I am aware of the high rates of violence, discrimination, and invasion of privacy against transgender people in Indiana and nationwide[.] I fear that if the public knows I am transgender, I will personally experience violence, discrimination, and an invasion of my privacy." Appellant's App. Vol. II p. 14. M.B. also included data about "the high rates of violence, discrimination, [] invasion of privacy," and harassment both nationwide and in Indiana. *Id.* at 14-16. She also noted that she feared for her safety

> because of my personal experience with violence and
> discrimination in my community. I know of a man in Orange
> County who has outspoken anti-trans views and has said that if
> he finds out about a trans person, he will kill them. I have also

faced discrimination from pharmacists when they discovered my gender identity.

*Id.* at 16.

[4] On November 19, 2018, the trial court held a hearing on M.B.'s request to prohibit public access. M.B. testified at the hearing. Among other things, she explained her fears to the trial court:

- "I believe it would be dangerous [if people learned that she was changing her name and gender marker]. There's lots of people, both within the United States and within the State of Indiana that would like to harm transgender people and there are some in Orange County that I do know of that it would be dangerous for me and I could get killed." Tr. Vol. II p. 8.
- "I have [personally faced discrimination based on gender identity] when picking up my prescriptions at the Paoli Walmart pharmacy one of the ladies that works there didn't want to serve me and I had to get someone else to help me." *Id.* at 9.
- ". . . I'm on Facebook quite a bit and there's someone who lives in Paoli, they have a red truck and they said if they knew someone was transgender and they saw them they would shoot them." *Id.*

Following the hearing, M.B. filed a supplemental memorandum regarding the request to prohibit public access.

[5] On December 4, 2018, the trial court denied M.B.'s request to prohibit public access. Among other things, the trial court found as follows:

9. At the hearing, only the testimony of [M.B.] was presented. [M.B.'s] 2 ½ minute testimony is summarized as follows:

a.    . . . [M.B.] testified that he/she [sic¹] suffers from "gender identity disorder". [M.B.] stated his/her [sic] name and gender marker are not correct. [M.B.] "perceives" himself/herself [sic] as a female however he/she [sic] was "assigned male hardware". This has created problems with how he/she [sic] perceives himself/herself [sic]. [M.B.] came to Court wearing women's clothing and hairstyle. [M.B.] had makeup on and spoke in a feminine voice. He [sic] requested that Court refer to her as [M.B.].

***

11.    . . . [I]t is readily apparent that [M.B.'s] evidence falls considerably short of proving by clear and convincing evidence that publication of the notice of the petition in this case would create "a significant risk of substantial harm". [M.B.] has failed to prove that following the statutorily mandated procedure of giving notice, in and of itself, would create a significant risk of substantial harm. No evidence was presented of any violence that has resulted to [M.B.] because of his/her [sic] trans-gender [sic²] identity. No evidence was presented of violence being perpetrated against an Indiana resident who identifies as trans-gender [sic]. A generalized statement of two violent acts occurring in [other states] is not persuasive

---

[1] Throughout its order, the trial court fails or refuses to use M.B.'s preferred pronoun. The order is also permeated with derision for M.B. We would hope that the trial courts of this state would show far greater respect (as well as objectivity and impartiality) to all litigants appearing before them.

[2] "Transgender" is one word, with no hyphen. *See, e.g.*, *Merriam-Webster Dictionary*, at https://www.merriam-webster.com/dictionary/transgender (last visited June 10, 2019); *MacMillan Dictionary*, at https://www.macmillandictionary.com/us/dictionary/american/transgender (last visited June 10, 2019); *Dictionary.com*, at https://www.dictionary.com/browse/transgender (last visited June 10, 2019).

to ignore the legal requirements of obtaining a name change pursuant to I.C. 34-28-2-3.

12. In [M.B.'s] pleadings there were concerns presented that giving notice by publication could be harmful to [M.B.] by "outing" the petitioners [sic] trans-gender [sic] identity or making public his [sic] trans-gender [sic] diagnosis. However, those concerns are not present here. The Petitioners [sic] actions, dress, and demeanor profess to all that he/she [sic] is trans-gender [sic]. It is not a secret or private diagnosis. It is readily apparent and obvious to the public. Following the statutorily mandated legal notice requirement will not "out" [M.B.], [M.B.'s] actions have already done that.

Appellant's App. Vol. II p. 7-10. M.B. now brings this interlocutory appeal.

## Discussion and Decision

We apply a de novo standard of review to matters of law, including the construction of statutes and rules. *In re A.L.*, 81 N.E.3d 283, 288 (Ind. Ct. App. 2017). To the extent that our review requires us to review the trial court's factual determinations, we will apply a clearly erroneous standard. *Id.*

We have considered this set of issues before. In *In re A.L.*, we found that "there is no statutory requirement to publish notice of intent to change one's gender marker" and that "there is a statutory requirement to publish notice of intent to change one's name, but that statute is explicitly subject to Administrative Rule 9 . . . ." *Id.* at 285.

[8]     In *A.L.*, we noted that as a general rule, a petitioner seeking a name change must give notice of the petition in a qualifying newspaper. The legislature has deemed Indiana Code chapter 34-28-2 to be subject to Administrative Rule 9, which provides that as a general rule, all court records are publicly accessible. Ind. Administrative Rule 9(D)(1). There is, however, a list of exceptions to that general rule, which are found in Rule 9(G). Relevant to this appeal is the exception for cases in which "[a]ccess or dissemination of the Court record will create a significant risk of substantial harm to the requestor . . . ." Admin. R. 9(G)(4)(a)(ii).[3]

[9]     Here, the trial court found that M.B. did not provide sufficient evidence to support her claim that maintaining public access to her case records (including the requirement of notice publication) would create a significant risk of substantial harm to her.

[10]    The trial court had two primary reasons for its denial of M.B.'s Administrative Rule 9 petition. First, it noted that she had failed to provide evidence of "any violence that has resulted to [M.B.]" because of her gender identity or of "violence being perpetrated against an Indiana resident" who identifies as

---

[3] We also note that this case may fall under the exception for case records that are excluded from public access or declared confidential by Indiana statute or other court rule. Admin. R. 9(G)(2)(b). Medical and mental health records are confidential and protected from public disclosure. *E.g.*, Ind. Code § 16-39-3-10 (declaring that a patient's mental health records and testimony related to a patient's mental health offered in a legal proceeding must be a confidential court record). A petitioner's status as transgender will likely implicate both her medical and mental health records.

transgender. Neither of these forms of evidence is required. Indeed, in *A.L.*, the trial court, in denying one of the petitions before it, found as follows:

> L.S. did not establish that he had been subject to specific threats or violence; that publishing his petition would subject him to an increased risk of violence or harassment that exceeds what he already faces as a member of the transgender community; or that the public filing of such court cases has resulted in targeted violence against transgender individuals.

81 N.E.3d at 290. This Court explicitly disapproved of that reasoning, noting the sobering statistics regarding the risk of harassment, violence, and homicide to the transgender population, both nationwide and in Indiana. *Id.* We likewise found that requiring a transgender person to publish his birth name and new name "would enable members of the general public to seek him out, placing him at a significant risk of harm. And in today's day and age, information that is published in a newspaper is likely to be published on the Internet, where it will remain in perpetuity, leaving [the transgender person] at risk for the rest of his life." *Id.* at 290-91.

In other words, the fact that M.B. did not provide evidence that she, herself, or other citizens of Indiana[4] have been a target of violence is of no moment. The goal of Rule 9 is proactive; it seeks to *prevent* harm. To force petitioners to wait

---

[4] Though in fact, M.B. *did* provide evidence of a specific act of violence to a transgender person in Indiana. Appellant's App. Vol. II p. 15. She also provided evidence of a specific act of discrimination that she has faced as a result of her gender identity. Tr. Vol. II p. 9.

until they have already experienced that harm would vitiate the purpose of the rule.

[12] Rather than focus on the evidence that M.B. did *not* provide, the trial court should have focused on the evidence she *did* provide. With respect to the general rates of discrimination, harassment, violence, and homicide experienced by people who are transgender, M.B. provided the following evidence:

> 8. Data shows that transgender individuals are disproportionately impacted by violence and homicide. Between 2013 and 2015, hate crimes against transgender people increased 239 percent, with LGBT people more likely than any other minority group to experience hate crimes in the United States. Haeyoung Park and Iaryna Mykhyalyshyn, *L.G.B.T. People Are More Likely to Be Targets of Hate Crimes Than Any Other Minority Group*, N.Y. Times, June 16, 2016.

> 9. The systemic violence transgender people experience neither begins nor ends with hate crimes, physical assault or homicide. Transgender people are more likely than the general population to experience discrimination, harassment, and violence in every facet of life, including family relations, education, employment, housing, public accommodations, obtaining accurate identification documents, and accessing adequate and appropriate medical treatment. *See e.g.* James *et al.*, *The Report of the 2015 U.S. Transgender Survey* (2016), *available* at http://www.ustranssurvey.org/reports/; *National Coalition of Anti-Violence Programs, A Report from the National Coalition of Anti-Violence Programs: Lesbian, Gay, Bisexual, Transgender, Queer, and HIV-Affected Hate Violence in 2013* (2014),

*available* at
http://www.avp.org/storage/documents/2013_ncavp_hv
report_final.pdf[5]; Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey 2* (2011), *available* at
http//www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

10.     This is no less true in the state of Indiana. A survey of transgender people in Indiana conducted in conjunction with the National Transgender Discrimination Survey found that 73% of respondents reported harassment in their K-12 school; and 27% reported physical assault. National Center for Transgender Equality and the National Gay and Lesbian Task Force, *Findings of the National Transgender Discrimination Survey: Indiana Results* (2015), *available* at
http://www.transequality.org/sites/default/files/docs/usts/USTSINStateReport%281017%29.pdf.  In another study of Transgender Hoosiers, 74% of respondents reported experiencing harassment or mistreatment on the job. Christy Mallory and Brad Sears, *Employment Discrimination Based On Sexual Orientation and Gender Identity in Indiana*, August 2017, *available* at
https://williamsinstitute.law.ucla.edu/research/in_discrimination_ aug_2017/[6].

11.     Often, this violence is fatal. In 2016, an Indiana transgender woman was shot in the face while her attacker yelled anti-transgender sentiments.  *Alleged Hate Group*

---

[5] We found a better citation for this resource to be as follows: http://avp.org/wp-content/uploads/2017/04/2013_ncavp_hvreport_final.pdf.

[6] We found a better citation for this resource to be as follows:  https://williamsinstitute.law.ucla.edu/wp-content/uploads/IN_discrimination_Aug_2017.pdf.

*Member Charged in Shooting of Trans Woman in Indiana*, The
Advocate (July 17, 2016), *available* at
http://www.advocate.com/transgender/2016/7/17/alleg
ed-hate-group-member-charged-shooting-trans-woman-
indiana. Across the nation, violence against transgender
individuals is on the rise. Maggie Astor, *Violence Against
Transgender People Is on the Rise, Advocates Say*, N.Y. Times,
Nov. 9, 2017.

Appellant's App. Vol. II p. 14-16. And M.B. also offered evidence of two
specific instances causing her to believe she is at great risk of public harm:

- "I have [personally faced discrimination based on gender identity] when
  picking up my prescriptions at the Paoli Walmart pharmacy one of the
  ladies that works there didn't want to serve me and I had to get someone
  else to help me." Tr. Vol. II p. 9.
- ". . . I'm on Facebook quite a bit and there's someone who lives in Paoli,
  they have a red truck and they said if they knew someone was
  transgender and they saw them they would shoot them." *Id.*

We find that this evidence readily supports M.B.'s argument that, if she had to
publish notice of her name change petition and maintain a publicly open case
file, she would be at significant risk of substantial harm. The trial court erred in
ruling otherwise.

[13] Second, we are compelled to address the trial court's conclusion that M.B.
could not be "outed" because of the way she presents in person. This subjective
assessment is not an element of an Administrative Rule 9 petition, nor should it
be. Appearance is in the eye of the beholder, and regardless of the trial court's
own opinions about how men and women "should" look, M.B. has the right to

appear as she desires while maintaining public confidentiality about her gender identity.  This was a wholly improper reason to deny M.B.'s petition.

[14] The trial court should have granted M.B.'s Administrative Rule 9 petition to waive publication of notice of her name change and to seal her case record.

[15] The judgment of the trial court is reversed and remanded with instructions that this case shall remain sealed and for further proceedings.

Najam, J., and Robb, J., concur.